This is Case No. 20-1847, Bobcar Media v. Aardvark Event Logistics. Mr. Cohen, please proceed. Thank you, Your Honor. Your Honor, may it please the Court, my name is Morris Cohen. I represent Bobcar in this matter. Your Honors, as the Second Circuit has held in ING, a district court's failure to provide adequate notice before a rule, a summary judgment dismissal, is almost always a reversible error. Here, the trade dress claim of Bobcar was dismissed on grounds that were never raised by Bobcar. It was dismissed sua sponte with no prior notice to Bobcar to address the Court's position. In particular, the Court found that Bobcar had to show it had trade dress and secondary meaning by Aardvark's first infringement in quote-unquote 2008. However, there are multiple reasons why we object to that finding. The first is that it's undisputed that Aardvark's first accused infringement was not in 2008. It was in 2009. Specifically, Aardvark so stated in their sworn interrogatory responses at A2-031, and it also so stated in its later brief at A3-3670 in the appendix. Had the Court raised these issues and given us notice, we would, of course, respond to them below. However, because of the fact that they never raised them, we never had a chance to respond to them, and as I indicated, the Second Circuit has held that such a proceeding or such a procedural course of action is almost always a reversible error. The second issue that we have is that the Court referred to the infringement. However, there was not just one infringement. There were multiple infringements. There were a series of infringements that began in 2009. However, there were later infringements in 2015 and in 2016. And as a result, even if, arguendo, the Court would not find secondary meaning as of 2009, which it did not even consider, there were still later infringements in 2015 and 2016 where it could have found or a jury could have found secondary meaning. And this Court itself, for example, in the Munchkin case, said that, and then I'm referring now to the 2009 date, that less than two years arguably could be enough for secondary meaning. So had the Court considered the proper date, the 2009 date, it arguably could have been enough for a jury to find secondary meaning. And each infringement, as we indicated, should have been dealt with separate because the case law refers to secondary meaning by the infringement, and there was more than one infringement. In addition, the Court made various, in our position, legal errors on the motions for summary judgment and errors in factually making determinations that were really for a jury. As one example, the Court erroneously viewed surveys as the be-all and end-all. And the Second Circuit has addressed this. For example, in the Thompson case, the Second Circuit has said that no single factor is determinative and every element need not be proved. We acknowledge that out of six factors on secondary meaning, we did not have one, we did not have a survey, which was one of the factors, so we only went for five of the factors. But the Second Circuit has expressly indicated that you don't have to prove every element and that no single factor is determinative. The Court, on the other hand, felt that this was the most important factor and that this was problematic or fatal to our case, but the Second Circuit has respectfully looked at it otherwise. In addition, the Court made other legal errors that disregarded or may have overlooked numerous cases by the Second Circuit on these issues. For example, with respect to media coverage, the Court held that Bobcorp must be identified as the source of the vehicle. But with respect, the Second Circuit has held otherwise. In the 20th Century v. Sandmarc-Stardust case, the Court held that that's not the case, that even an anonymous producer can show secondary meaning. The Court also held that Bobcorp has to show third-party copying. But the Second Circuit has not so held. On the contrary, in the 20th Century, where the Court held that copying, meaning copying by the accused defendant, is persuasive, if not conclusive evidence of secondary meaning, without requiring that there be copying by a third party. The Court also held that the advertising that we proved, that we showed, was only relevant if we had the dollars and cents, if we had the exact amounts that were spent in each of those advertising. But we took the position that, respectfully, that advertising has a purpose for secondary meaning, and it's to show the impact of the company activities on brand awareness. And that cannot necessarily be measured in dollars and cents alone. There are many, especially nowadays, forms of advertising and promotional activities that may even be free, such as Twitter and Facebook and so forth, that can have an enormous impact on brand awareness and on knowledge of a particular company or an issue, and we see that every day. That may not cost anything, it may be free, but yet it's a factor for a jury to consider in determining brand awareness, secondary meaning. And likewise, another error was the Court's holding that exclusivity can't be shown in a short period of time, but as I had indicated in the Munchkin case, this Court said that there are no hard and fast rules, and less than two years in that case was held to be sufficient. The Court also, with respect to the trade dress claim, made numerous factual determinations. Secondary meaning is a heavily factual matter. It's something that requires a large number of, as we said, six factors have to be determined, advertising impact, brand awareness. It's what would be perceived by the public. And the Court, unfortunately, took inferences against Bob Corr, but really, since this is summary judgment, it's something that should have had inferences taken in favor of Bob Corr, or at least given the jury the opportunity to make their decisions. Even in, for example, the survey issue, Aardvark's own expert agreed with Bob Corr that surveys are not the be-all and end-all. Mr. Hampton, who is a former commissioner of trademarks, said he could not recall a single case in which he had ever used a survey, and he said, quote, they're expensive, and even though courts claim they want them, they seem like they knock them out as much as they accept them. And, you know, a quarter million dollars to have your survey knocked out is not a way to ingratiate yourself with your client. All in all, on the secondary meaning issue, the Court made numerous inferences against Bob Corr, even though we had video testimonials by T-Mobile's chief executive officer. Mr. Cohen, this is Ed Trenum. Can I just ask you about one of the, I guess, legal points that I think you made about the time as of which secondary meaning needs to be measured? What authority specifically, and what's the rationale for any such authority that says if a competitor comes into the market at a time when the alleged trade dress owner does not have secondary meaning, so no relevant market recognition that something that looks like this belongs to this particular source, what authority says that even if the incumbent is outspending over the next several years the insurgent and acquires secondary meaning later, at that point the insurgent is infringing, even if it wouldn't be infringing when it came in? That's not a very intuitive legal result, and I wonder where it comes from. Thank you, Your Honor. As far as I can tell, based upon our briefs and the other side's briefs, I don't believe that there's any case law directly on point. I think it may be a matter of first impression because neither side could find a case that addressed this particular question. But I think in terms of the rationale, I can explain what our rationale, our reasoning is. First, our reasoning is based on Lucky Brands, in which the Supreme Court indicated that marketplace realities change from year to year, and something that accrues a first cause of action a year later can be very different in terms of a second cause of action. And we maintain that we have a separate cause of action of each infringement because each one is a separate product. We could have accused one product and not the other of the multiple products that are at issue here. The case law talks about before the infringement began, such as the Braun case, and we maintain that there are multiple infringements, and in fact, they're punctuated infringements. And what I mean by that is that our bargain, likewise the party, can start infringing and then can stop, and then months later or a year later start a new infringement. And I mean, had we known that the court was going to take this position, we could have, say, only accused the second infringement or the third infringement or the last infringement, and then it would be accrued or our proof would have to be accrued as of that last infringement. And to give you an example of what I mean in terms of, because you asked about the intuitive aspect to it, let's say, for example, Aardvark came out with an infringement. And this is a hypothetical. Let's say Aardvark came out with an accused infringement in 2008, a year after the popcorn had been in the market. And then it came out with another infringement in 2015 or 2016. And we accused both, not knowing that the district court was going to take such a position. The fact that Aardvark may take the position that there's no secondary meaning for the first infringement, if years go by and then there's a new infringement, intuitively, Bob Carr should be able to allege that the new infringement, at least, is a violation of the trade dress rights, even if the first infringement did not. And the problem with this from the litigation perspective is let's assume that there are multiple parties. Counsel, you're using your rebuttal time, which you're free to do, but I just wanted to make you aware of it. In that case, I reserve the remaining time for rebuttal, Your Honor. Thank you. Sure. Okay. Let's hear from Mr. Weissman. Thank you very much. This is Peter Weissman on behalf of Aardvark. May I please use the court? Can you hear me okay? Yes. Thank you. Just to pick up on the question that Judge Taranto was asking, there's absolutely no authority for this multiple infringement proposition. It's completely contrived by Bob Carr. Is there authority the other way? I think we cited some authority in our case, but, I mean, if you think about it, there's really nothing special. Well, I can easily see policy arguments on both sides, and I think Mr. Cohen was articulating kind of a policy idea on his side of that. Well, I don't know that this has to do with policy. Nobody has ever raised this type of a thing. Once Aardvark was in the marketplace, it was continuously in the marketplace. There was no suggestion that they stopped and started. I don't understand this multiple infringement. It could apply to every single case that is before you. I mean, there's nothing special about this case that would distinguish it to justify the concept of multiple infringement. Every single case you see about trade dress or trademark infringement, the accused defendant is in the marketplace and continues. Since Aardvark entered the marketplace, Bob Carr has not had exclusivity. It's as simple as that. This is not a case of first impression like Mr. Cohen suggests. Mr. Weissman, I think Mr. Cohen began his point about that particular issue by saying that in your summary judgment motion, you never asserted that secondary meaning had to be established at the time of Aardvark's entry, whether that was late 2008 or March 2009. Is that right? In your summary judgment motion, you didn't identify a timing requirement as existing and as a requirement as to which the other side lacked evidence. Thank you, yes. So, I mean, that's such a basic proposition. Even though you haven't identified in this oral argument a single authority for it? The authority is first in right is first in time. That which comes before invalidates. That which comes after infringes. I mean, that's just a basic concept to all patents, trademarks, and copyrights. I mean, to say that you don't have to have a trademark before you actually sue somebody for trademark infringement, it's just a little bit far-fetched. I mean, to say I don't have to have a patent before I sue someone on patent infringement, that's just a basic concept. I don't give any credence to that at all. So I would say that, again, there's nothing unique about this case that would justify this multiple infringement concept. And as far as the wrong date goes, as we pointed out in our brief, this is somewhat of a so what case. I mean, Bob Carr has pointed to nothing new about that date that would come into effect and change the ruling in this case. Has Bob Carr identified – suppose it were correct that putting aside the difference between 2008 and early 2009, but this suit covers a number of years after that. Suppose later events could be actionable under a secondary meeting theory, even if the earlier ones didn't. Has Bob Carr identified or pointed to evidence that would suggest the possibility of a different result? And relevant to that, did it have an opportunity to do that, or are we talking about something that it could have shown to be prejudicial in terms of the timing but has not done so? Well, I would say, if anything, Aardvark probably built up secondary meaning before Bob Carr did. I mean, did Bob Carr continue with its vehicle program? Sure. But there's nothing in the record that would lead me to think that it attained secondary meaning. In fact, so these products, these are vehicles that go to big customers like T-Mobile and the like. These are $100,000 vehicle programs that they do. They do this for a whole month, sometimes several months, sometimes a year. So the customers are sophisticated and they know where these products are coming from, and they often do side-by-side comparisons, which was in the record. So it's clear that the two programs were different, the vehicles offered by Bob Carr and those by Aardvark. Just one other thing I would like to point out is that Bob Carr has never pointed to any nexus, no connection between any of the six factors and their trade dress. They don't even put the trade dress definition into their brief. I mean, there's nothing to understand why any of these six factors are relevant to this particular vehicle or the trade dress in particular. Counsel, this is Judge Moore. If you don't mind, I'd like to ask you to address the standing question with regard to the patent infringement claim. And my question in particular to you is, was the district court right in determining no statutory standing in this case based on the non-proton agreement when you can otherwise cure a lack of statutory standing through just adding the patent holder? Thank you. I'm not sure I fully understand your question, but I'll say this. So the issue here is very clear-cut. Either you have standing on the day that you sue or you don't. And you cannot correct that retroactively by an assignment, and that's the ENZO case that we cite in our brief. Well, you can cure a defect, at least in the pleading, right, by adding the patentee. An exclusive licensee can bring a suit, and if it's determined the exclusive licensee doesn't have statutory standing at the time the complaint was filed, they can cure that defect by adding the patentee in. Is that right? Well, that's not the issue here, of course, but I believe that is probably correct. But I think that has to do with, and actually the situation here was that the judge did try to let Bob Carr correct this. They gave Bob Carr an opportunity to join the inventors to this suit, and Bob Carr denied that. The judge gave 10 days, and Bob Carr said we need another 10 days, and the judge gave him that, and they failed to do it. And counsel, just out of curiosity, the dismissal of the patent infringement claim was without prejudice. Is that right? Correct. So they could conceivably bring the claim again tomorrow just with the inventors added into the complaint, and then it would meet the standing requirement. Is that right? Correct, if you're assuming that the assignment documents are good, yes. Well, actually, if the non-protunct agreement is good, even if it's not effective retroactively, it could be effective now. And so could they conceivably now rebring the patent infringement claim all by themselves without even adding in the names of the individual inventors? Because you're absolutely right that ENZO says assignments can't work retroactively, but, you know, this is now prospectively because there's been this non-protunct agreement that's been entered. So could they now have a written assignment? Could they bring the suit by themselves tomorrow and meet the standing requirement? I mean, that wasn't the situation before us, but, yeah, I mean, once they have an assignment, they can prospectively bring an action. Okay. Thank you. I was waiting for you to ask the next question, which is, you know, so what's the difference? And the difference here is, you know, if you don't have standing on day one, it becomes a he said, she said. I mean, people come out of the woodwork. They said, oh, I own this, you own this, who knows. Inventors die. They go missing. People get divorced. I had a situation where – Well, in fact, in this case, didn't one of the depositions, I think it was, say, well, I think we had an assignment. We must have had an assignment. I think there was an assignment. Sure, there had to have been an assignment. Wasn't that kind of a little bit of what happened in this case, in fact? Yes, that 30B6 witness was not well prepared, and he certainly was not aware of any written document, and I think your perception was correct that he was kind of wobbling on what it meant, really. So, like I said, I mean, until a written assignment is actually done, I mean, I think this is a good clause, the requirement for a written assignment, and the burden on Bob Carr was minimal. It is a one- or two-page document. It's a form template, easy to complete, and I'm getting a little static. Is that bothering anyone? Yeah, we can hear you. The static is pretty bad. I'm not sure if you could take us off speaker or something, if that might help. I just did. There we go. I just picked up my handset, but I still hear it. Yeah, us too, but I think that I can tolerate it. Go ahead. Okay, thank you. So, this law is not much of a burden. I mean, it takes very little time to do an assignment. It's a form document, and most attorneys do that. You have to also submit a declaration in the case. So, most attorneys will send a declaration and assignment at the same time, and you just have them signed, and you just record them with the patent office, and you're done, and that's it. I think the burden on people who file assignments is relatively low, and the benefit is very great. It gives clear title and avoids multiple people from coming after you. I'm going to switch over, if I may, to the issue with the New York unfair competition count. In Bob Carr's reply brief, they had asserted that the court applied the wrong law, and what happened in that, the court's decision was that because Bob Carr's trade dress is not protectable because there was no secondary meaning, the court said that the state law unfair competition claims were also dismissed as well. And so Bob Carr, in his reply brief, said that the court applied the wrong law because secondary meaning isn't needed. But that's completely wrong. It cites to this case the ITC decision, which was the New York Court of Appeals, and if you look at the appellate history for that, so the Court of Appeals case did recite a test, and you'll notice that the test has a lot of the same things as required for secondary meaning, and if you look at the appellate history, the question before the Court of Appeals was certified by the Second Circuit. When it came back to the Second Circuit, they actually said, we discern, and I'll quote here, we discern no material difference between the standard established by these factors, and here they mean the six secondary meaning factors, and those enumerated by the New York Court of Appeals. So it's clear that secondary meaning is required, and Judge Etkin was correct in his decision there. It's also noted that I believe Bob Carr, in its reply brief to the district court, it failed to argue anything other than secondary meaning, and in fact, its entire position consisted of five lines of argument, and that's at Appendix 2600. So Bob Carr never raised this in the lower court either. As to Daubert, there was one thing I did want to address here. You know, I wanted to point out that with respect to the Daubert motion, the standard is very high here. It's an abuse of discretion. Bob Carr never argues about an abuse of discretion. Their argument was that the testimony by the expert would have been probative. So I think at the outset, its motion fails just on that reason alone. Okay. Thank you, counsel. Let's have the rebuttal time by Mr. Cohen. Please proceed, Mr. Cohen. Thank you, Your Honor. So I'd like to try to go to each of those quickly. The first is with respect to the start and stop of the infringement. Aardvark did start and stop infringement. At the appendix at A2338, it lists each of the campaigns that are accused.  Each campaign was started on a particular date, ended at a particular date, and then that campaign was over, and then there may have been a later infringement that was accused, but it was a different product. And the fact that it's a different product is admitted by Aardvark itself. Aardvark stated in appendix 1085, paragraph 43, that, quote, the Aardvark vehicles, while branded under the same name, are generally different. And it mentions at that same site that they're customized. Likewise, the CEO said the same thing at appendix 1948, page 228, lines 3 to 25. So it's not accurate that this is just one infringement. There were multiple vehicles, which Aardvark itself said were all different. Next, I'd like to, and I can go back to this if you'd like, but I just want to try to, with my rebuttal time, I'd like to address the standing issue. Well, just lastly on that, I think it is corrected. Bob Carr never had the opportunity to show different evidence on this at the lower court. And this is, he claimed, Mr. Weiston claimed that, you know, it's basic. You have to have a trademark. But this is a question of different accused marks. And we claim we had it. We claim we had rights. But for each mark, we claim the analysis has to be taken of itself. For example, let's assume that we had sued Aardvark and T-Mobile. And T-Mobile only started infringing in 2015. Under their analysis, under their position, it's a different analysis in the same case for T-Mobile and for Aardvark. For T-Mobile, the question is, because they're only accused of infringement in 2015, whether there's secondary meaning as of 2015. According to their position, for Bob Carr, it's infringement has to be validity and trade dress. Secondary meaning has to be determined as of 2009. The same case and the same vehicle, and we're subjecting that vehicle that was introduced in 2015 for T-Mobile to two different standards. And we just submit that that's not logical. It doesn't make sense. It would not be good law. With respect to the standing issue, if I may turn to that, the inventors in this case executed a non-pro-tunk. Excuse me. This is Judge Shaw here. I have one question. Why didn't you, your client, choose to take up the judge's invitation via the dismissal without prejudice and just refile the patent law claims? Yes, Your Honor. The client executed an assignment which transferred all of their rights to Bob Carr. So to the extent that the inventors had any rights, they executed not only a non-pro-tunk. They executed a new assignment that transferred all of their rights to Bob Carr. So as a result— Right. Excuse me. Time is fleeting. No, I understand what you're saying. But in response or picking up on the colloquy that the presiding judge was having with Mr. Wiseman, why couldn't Bob Carr or why didn't Bob Carr just file, in view of the new assignment, the patent law claim? In other words, with the inventors listed? No, I mean, they've assigned the rights to Bob Carr in what was a non-pro-tunk assignment, but as the presiding judge said is now prospective. Couldn't Bob Carr just go in now and refile on the design patent claims? It could. The problem is that there's potential issues of statute of limitations because of the passage of time. And in addition, to the extent that this court adjudicated several decisions afterwards, which we weren't aware of because they came out afterwards, such as the Lone Star case and such as the Schwedeman case, our position is a little bit different now than the position that it was then because of the fact that those cases had not come out and also the court had not had the opportunity to address them. Bob Carr could have potentially refiled. Its preference was to have Bob Carr in the suit and its position was that if the inventors joined would be enough, the inventors transferring all those rights to Bob Carr should also be enough. And everyone agreed, there was no dispute, that Bob Carr owned all the rights. And the president had in fact remembered that they had both signed the assignment. Even though the other inventor who has multiple companies was hazier, the inventor, Mr. Benjamin Cohen, has only one company, Bob Carr, and he remembered distinctly when they both executed the assignment. So we felt that the court erred on that issue. We didn't want to, if possible, have the inventors in the suit individually. We didn't want them to be sued and countersued individually. Our position was we felt that it was clear from all the testimonies that everyone agreed that only Bob Carr owned the rights. It would be enough, for example, on the Lone Star without all substantial rights, but there's no dispute that the only one who had the rights was Bob Carr. There was no risk of multiple inconsistent suits, which we think is the important principle standing. And there's no dispute there was an injury which can fairly be traced to defendant and likely addressed by a favorable judgment, which is also the standard in Lone Star. Based upon the fact that there's an injury and no possibility of multiple inconsistent suits, we believe it would be inappropriate to create an additional burden that somebody else would have to be part of a suit or there would have to be some additional showing. When the question here is whether Bob Carr is injured, it was, and whether there's a possibility of multiple inconsistent suits, it wasn't. Okay, thank you, Mr. Cohen. I thank both counsel. The case is taken under submission. The honorable court is adjourned until tomorrow morning at 10 a.m.